UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                    )
JACK DICKINSON,                     )
                                    )   No. C06-1215RSL
                     Plaintiff,     )
         v.                         )   ORDER GRANTING IN PART AND
                                    )   DENYING IN PART INDIVIDUAL
THE CITY OF KENT, *et al.*,         )   DEFENDANTS' MOTION FOR
                                    )   SUMMARY JUDGMENT BASED
                     Defendants.    )   ON QUALIFIED IMMUNITY
_____)

## I. INTRODUCTION

This matter comes before the Court on defendant Officer Bateman's, defendant Officer Ford's, defendant Officer Henson's, and defendant Sergeant Bourne's (hereinafter collectively "defendants") "Motion for Summary Judgment Re: Qualified Immunity" (Dkt. #21). Defendants request dismissal from this case because they contend that using a police dog to bite and drag plaintiff from a stolen pickup truck was a reasonable use of force and that it was not clearly established that using a dog in this manner violated plaintiff's Fourth Amendment rights. In response, plaintiff asserts that summary judgment on qualified immunity is not proper because there are disputed issues of material fact about the reasonableness of defendants' actions and that plaintiff had a clearly established right to a warning before the police dog was released. The Court held a hearing on the motion on June 20, 2007 and heard oral argument from counsel for

ORDER GRANTING IN PART AND DENYING
IN PART INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

plaintiff and defendants. For the reasons set forth below, the Court grants in part and denies in part defendants' motion for qualified immunity.

## II. DISCUSSION

### A.   Background

The following facts are not in dispute. On October 6, 2003, at approximately 7:00 p.m., plaintiff and Wendy Gabel were in a green pickup truck at a McDonald's in the City of Kent where they were contacted by two Kent police officers, Officer Wales and defendant Bourne. See Dkt. #22 (Bourne Decl.) at ¶4; Dkt. #28 (Dickinson Dep.) at 18:22-25. Plaintiff was in the passenger seat of the truck and Ms. Gabel was in the driver's seat. Id. Plaintiff and Ms. Gabel were instructed not to drive because they appeared intoxicated. Id. About an hour later, defendant Bateman was dispatched to investigate a possible DUI call involving a stolen green pickup truck. See Dkt. #22 (Bateman Decl.) at ¶3. As officer Bateman responded, the truck turned into the parking lot of a 7-Eleven store in Kent. See Dkt. #29 (Bateman Narrative) at 1; Dickinson Dep. at 12:19-24. Defendant Bateman stopped the green pickup truck by driving his patrol car in front of it. See Bateman Decl. at ¶5. Defendant Bateman got out of his car and pointed his handgun at the cab of the truck. See Bateman Narrative at 1; Dickinson Dep. at 24:6-8. Officer Bateman instructed the driver of the pickup to throw the keys out the window. See Bateman Decl. at ¶7; Dickinson Dep. at 21:5-9. During this time, plaintiff, who had been passed out in the passenger seat due to intoxication, woke up. See Bateman Decl. at ¶7; Dickinson Dep. at 13:11; 20:22. Plaintiff awoke still intoxicated and wrestled with Ms. Gabel in the front of the truck for the keys. See Bateman Decl. at ¶8; Dickinson Dep at 22:23-25; 25:2-13; 33:20-21. Ms. Gabel got out of the truck, but then attempted to return to the cab of the truck. See Bateman Decl. at ¶¶9, 10; Dickinson Dep. at 24:15-18. Defendants Ford and Henson arrived at the incident. See Bateman Decl. at ¶11. When Ms. Gabel was returning to the truck, defendant Henson pulled her to the ground and handcuffed her. See Bateman Decl. at ¶11;

ORDER GRANTING IN PART AND DENYING
IN PART INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT           -2-

Dickinson Dep. at 26:2-3. Plaintiff was again ordered out of the truck. See Dkt. #22 (Ford Decl.) at ¶6; Dickinson Dep. at 26:2-5. Defendant Ford attempted to open the passenger door of the truck, but it was locked. See Ford Decl. at ¶7; Dickinson Dep. at 28:8-10. Plaintiff then reached for the passenger door lock. See Bateman Decl. at ¶12; Dickinson Dep. at 26:13-14. After plaintiff reached toward the lock, defendant Bateman opened the passenger door of the truck. See Bateman Decl. at ¶12; Dickinson Dep. at 28:8-10. After the door was open, defendant Ford sent police dog Jedi to extract plaintiff from the pickup. See Ford Decl. at ¶10; Dickinson Dep. at 13:23-24. Officer Bourne then arrived at the incident. See Bourne Decl. at ¶6. After police dog Jedi pulled plaintiff from the truck, plaintiff was handcuffed and taken to the hospital. See Ford Decl. at ¶10; Dickinson Dep. at 30:10-12. Plaintiff sustained puncture wounds on his leg at the time of the incident. See Dkt. #28 (Ford Narrative) at 2. In December 2003, plaintiff's leg was amputated below the knee. See Dkt. #24 (Spiegler Decl.) at 6.

The following issues of material fact are in dispute:

a) whether defendant Ford gave plaintiff a warning before releasing police dog Jedi; see Dickinson Dep. at 27:22-24 ("Q. Were you ever – or did you ever hear any warning that a dog was going to be released? A. No, there was no warning."); Bateman Decl. at ¶13 ("I acted as Officer Ford's cover agent as he gave additional warnings and then released the dog.");

b) whether plaintiff was unlocking the passenger door of the truck or whether he was attempting to check to make sure the door was locked; see Ford Decl. at ¶7 ("Plaintiff then began fumbling with the door seemingly in an effort to make sure it was locked and he unlocked it instead."); Dickinson Dep. at 13:19 - 14:2 ("[T]hey were yelling at me to get out. And I couldn't – I was trying to find the door lock, and then I just told them to f[] off because I was getting really irritated because I couldn't get out quick enough. And the next thing I know is, when I got the door unlocked, it flew up and the dog came in. I remember it grabbed a hold of my leg and I was trying to get out at the same time. The next thing I know is, I'm on the ground

ORDER GRANTING IN PART AND DENYING
IN PART INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT            -3-

and the dog's still chewing on me and I'm trying to push him off.");

c) whether it was raining at the time of the incident, thereby preventing the use of alternative means of force like OC spray; see Bateman Decl. at ¶18 ("Use of OC spray on Dickinson to gain compliance would have been ineffective as there was a driving rain storm occurring during this incident."); Dickinson Dep. at 27:25 - 28:4 ("Q. When you say 'fairly clear,' was it raining?  A. No.").

**B.  Discussion**

In reviewing a qualified immunity defense on a motion for summary judgment, the Court is "required to view all facts and draw all reasonable inferences in favor of the nonmoving party." Brosseau v. Haugen, 543 U.S. 194, 195 n.2 (2004) (per curium); see also Motley v. Parks, 432 F.3d 1072, 1075 n.1 (9th Cir. 2005) (en banc) (accepting plaintiffs' recitation of the facts because the case arose in the posture of a motion for summary judgment and involved issues of qualified immunity).  The Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001), established a two-part test to resolve claims of qualified immunity.  The two parts of this test are discussed, in the order required by Saucier, below.[1]

**1.  Was a constitutional right violated?**

In ruling on a qualified immunity defense, the Court must first consider "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." Saucier, 533 U.S. at 201.  The constitutional right at issue in this case involves the Fourth Amendment right to be free from the use of excessive force during a "seizure" by law enforcement officers.  Under Graham v. Connor, 490 U.S. 386 (1989), claims of excessive force

---

[1] See Brosseau, 543 U.S. at 600-01 (Breyer, J., concurring) ("Saucier requires lower courts to decide (1) the constitutional question prior to deciding (2) the qualified immunity question."); accord Scott v. Harris, 127 S. Ct. 1769, 1774 n.4 (2007).

ORDER GRANTING IN PART AND DENYING
IN PART INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT            -4-

are examined for "reasonableness." Id. at 396. The factors in the reasonableness inquiry include: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005) (en banc) (quoting Graham, 490 U.S. at 396). "[A]n additional factor . . . is the availability of alternative methods of capturing or subduing a suspect." Id. at 703. This reasonableness determination requires balancing the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake" from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396 (internal citation omitted). "The need for such balancing means that 'summary judgment . . . in excessive force cases should be granted sparingly.'" Boyd v. Benton County, 374 F.3d 773, 779 (9th Cir. 2004) (quoting Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002) (alternation in original).

The Court must first examine the quantum of force used against plaintiff before turning to the reasonableness of the force. See Chew v. Gates, 27 F.3d 1432, 1441 (9th Cir. 1994) ("The three factors articulated in Graham, and other factors bearing on the reasonableness of a particular application of force, are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure – an analysis the district court never explicitly undertook."). The amount of force used here was considerable. The use of police dog Jedi to drag plaintiff out of the truck resulted in multiple puncture wounds. See Ford Narrative at 2 (stating that plaintiff sustained 4 puncture wounds on the front of his thigh and 7 on the outside and rear thigh). Accordingly, the Court views its analysis under the Graham factors below in light of this considerable quantum of force.[2]

---

[2] In his complaint, plaintiff does not specify which acts constitute the "unreasonable force." See Dkt. #1. It is clear that the gravamen of plaintiff's claim is defendants' use of the police dog. See

ORDER GRANTING IN PART AND DENYING
IN PART INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT          -5-

### a. The threat to officers and others.

Turning to the Graham factors, the Court first begins with the "most important single element of the three specified factors: whether the suspect poses an immediate threat to the safety of the officers or others." Chew, 27 F.3d at 1441. Accepting plaintiff's version of the facts as true,[3] and drawing all reasonable inferences in favor plaintiff, this first factor weighs in favor of plaintiff. At the time police dog Jedi was released, plaintiff was boxed-in by the police. The front of the truck was blocked by defendant Bateman's patrol car. See Bateman Decl. at ¶4 ("I pulled my patrol car directly in front of the truck to block its forward movement."). The back of the truck was blocked by defendant Ford's car. See Ford Decl. at ¶5 ("I parked my patrol car behind the suspect's vehicle"). And, the officers themselves characterize Dickinson's situation as being "barricaded inside" the truck. See Bateman Decl. at ¶12 ("Dickinson then began fiddling with the door lock seemingly in an effort to lock the cab of the truck and more effectively barricade himself inside."). Given these facts, the court cannot conclude that plaintiff was an immediate threat to the officers and others.

---

Response at 1 ("This claim arises out of a police dog mauling"). Plaintiff, however, does not state whether defendant Bateman's display of his handgun is at issue in this case. In order to focus the issues for trial, the Court concludes that under the facts of this case it was reasonable as a matter of law for defendant Bateman to point his handgun at plaintiff and accordingly defendants are immune from suit for this action. The Court acknowledges that an officer's display of a handgun can constitute excessive force under some circumstances. See Robinson v. Solano County, 278 F.3d 1007, 1014-15 (9th Cir. 2002). In this case, defendant Bateman was faced with a serious situation with two auto theft and DUI suspects acting in a highly odd way in a truck with a running engine that had not been searched for weapons. In light of this volatile situation, defendant Bateman's decision to point his weapon at plaintiff was reasonable. See Alexander v. County of Los Angeles, 64 F.3d 1315, (9th Cir. 1995) ("It is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable."). Additionally, at oral argument, plaintiff's counsel acknowledged that plaintiff's claim was based only on the use of the police dog.

[3] See Bingham v. City of Manhattan Beach, 341 F.3d 939, 947 (9th Cir. 2003) (accepting as true plaintiff's version of the facts on review of district court's grant of summary judgment on qualified immunity).

ORDER GRANTING IN PART AND DENYING
IN PART INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT            -6-

### b. Severity of the crime.

The second factor under <u>Graham</u> is the consideration of the severity of the crime. Here, given the stolen vehicle report, the defendants had probable cause to believe that plaintiff was committing the felony of taking a motor vehicle without permission, even if plaintiff was a passenger in the truck. <u>See</u> RCW 9A.56.070 (1975), <u>recodified as</u> RCW 9A.56.075(1); <u>Washington v. Pettitt</u>, 93 Wn.2d 288, 292 (1980) ("The single crime of taking a motor vehicle without permission may be committed either by actually taking the automobile or by riding in it, knowing it to have been unlawfully taken."). In <u>Miller v. Clark County</u>, 340 F.3d 959, 964 (9th Cir. 2003), the Ninth Circuit addressed the <u>Graham</u> reasonableness analysis in the context of the nature of the crime, concluding that: "the government has an undeniable legitimate interest in apprehending criminal suspects, and that interest is even stronger when the criminal is, like [plaintiff], suspected of a felony, which is by definition a crime deemed serious by the state. This factor strongly favors the government." It is the same here. Plaintiff was suspected of committing a felony and there was a strong governmental interest in apprehending him. Accordingly, the severity of the crime reasonableness factor under <u>Graham</u> favors defendants' use of force.

### c. Resisting or evading arrest by flight.

The third factor under <u>Graham</u> is whether the individual actively resisted arrest or attempted to evade arrest by flight. In this case, plaintiff was not attempting to evade arrest by flight, and the issue of whether plaintiff was actively resisting arrest is the subject of a disputed issue of fact. On plaintiff's version of the facts, before police dog Jedi was released, plaintiff had just unlocked the door in an effort to get out of the truck. <u>See</u> Dickinson Dep. at 13:19 - 14:2. Plaintiff further alleges that he yelled expletives in response to defendants' request for him to get out of the truck because he could not find the lock to get out fast enough. <u>Id.</u> ("[T]hey were yelling at me to get out. And I couldn't – I was trying to find the door lock, and

ORDER GRANTING IN PART AND DENYING
IN PART INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT         -7-

then I just told them to f[] off because I was getting really irritated because I couldn't get out quick enough."). Accepting this as true, the third <u>Graham</u>-factor tips in favor of plaintiff.

### d. Availability of alternative methods of capturing or subduing plaintiff.

The Court may also consider the ability of alternative methods of capturing or subduing a suspect as part of the <u>Graham</u> analysis. <u>See</u> <u>Smith</u>, 394 F.3d at 703. In this case, defendants have asserted that the use of a taser was not viable given the concern for their safety. <u>See</u> Bateman Decl. at ¶18 ("[U]se of taser would require me to take unnecessary risks and expose myself to potential gunfire to deploy that weapon."); Dkt. #22 (Ovens Decl.) at ¶¶12, 13. Plaintiff's expert, however, disagrees. <u>See</u> Dkt. #26 (Baxter Decl.) at ¶6(d) ("[T]he M26 Taser could have been deployed."). Whether defendants could have used an alternative method like OC spray instead of deploying the police dog involves a disputed issue of material fact because defendant contends that OC spray could not be used because of a "driving rain storm" at the time of the incident. <u>See</u> Bateman Decl. at ¶18. In contrast, plaintiff alleges it was not raining, but "fairly clear." <u>See</u> Dickinson Dep. at 27:25 - 28:4. On a motion for summary judgment, the Court must accept plaintiff's assertion and conclude based on defendants' declarations that if the weather was clear, OC spray was an alternative means of subduing plaintiff.

### e. The lack of warning before Jedi's release.

In <u>Deorle v. Rutherford</u>, 272 F.3d 1272, 1274 (9th Cir. 2001), the Ninth Circuit instructed that "the giving of a warning or the failure to do so is a factor to be considered in applying the <u>Graham</u> balancing test." As discussed in section II.2 below, on plaintiff's version of the facts, no warning was given before police dog Jedi was released. <u>See</u> Dickinson Dep. at 27:22-24; 52:13-15; <u>see also id.</u> at 32:15-16 ("I had no warning that the animal was going to come in at me."). Furthermore, despite defendant Ford's numerous statements in the record, he has never asserted that he warned plaintiff before releasing Jedi. <u>See</u> Dkt. #22 (Ford Decl.) at ¶10; Dkt. #28, Ford Supplemental Narrative; Dkt. #42 (Ford Decl.). In this case, the absence of a warning

ORDER GRANTING IN PART AND DENYING
IN PART INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT        -8-

tips the balance of the Graham reasonableness inquiry in favor of plaintiff.

In summary, applying the Graham reasonableness factors to the facts in the light most favorable to plaintiff,[4] the Court concludes that plaintiff has sufficiently alleged a Fourth Amendment violation. Accordingly, the Court next considers whether the right at issue was "clearly established."

**2. Was the fourth amendment right clearly established?**

In their motion, defendants contend:

> While Officer Ford asserts that he repeatedly warned Plaintiff that the dog would be sent if he did not comply with commands, and that the dog was barking incessantly, putting Plaintiff on notice that a police dog was in the vicinity, Plaintiff specifically denied this at his deposition. This disputed fact has no bearing on whether qualified immunity applies as the use of the dog was reasonable even assuming that no warning was issued.

See Motion at 7 n.2. Based on the record before the Court, this assertion is both factually and legally incorrect. First, contrary to defendants' assertion, nowhere in the record does defendant Ford state that he warned plaintiff before releasing Jedi. Notably absent from defendant Ford's declaration is any mention of a warning:

> I determined that officer safety concerns dictated that I send police dog Jedi to extract Plaintiff from the vehicle. Jedi could remove the Plaintiff from the truck while Officer Bateman and I remained in relatively safe positions of cover. As soon as Jedi pulled plaintiff from the cab, Officer Bateman and I moved into position to take him into custody. Once we determined that we could safely take Plaintiff into custody, Jedi was ordered to release Plaintiff and move away from him. When ordered to do so, Jedi complied immediately. Jedi was holding Plaintiff only as long as necessary for myself and Officer Bateman to safely take him into custody.

See Dkt. #22 (Ford Decl.) at ¶10. Defendant Ford's sworn "Kent Police Department Supplemental Narrative," also does not state that any warning was given that a police dog would

---

[4] In reviewing defendants' qualified immunity defense on summary judgment, the Court construes the disputed facts in the light most favorable to plaintiff. For example, in Wall v. County of Orange, 364 F.3d 1107, 1112 (9th Cir. 2004), the Ninth Circuit reversed the district court's grant of summary judgment to defendants on a qualified immunity defense because the Ninth Circuit held that the district court improperly relied on defendants' statement of facts.

ORDER GRANTING IN PART AND DENYING
IN PART INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT            -9-

be deployed:

> While he [Officer Henson] was doing this [handcuffing the female passenger], I turned my attention to the male passenger. I approached the truck from the right rear side and began yelling commands for him to get out of the truck. Officer Bateman was in from of him yelling the same commands. In response to our commands the male subject yelled, "F[] Off!" at us. I reached up to open his door but the door was locked. We gave him several more commands to come out. At this time Officer Bateman reached out and opened the door. Officer Bateman told me later the male subject had been fumbling with the lock and had unlocked it. Due to my position I could not see this activity.
>
> When Officer Bateman opened the door we both gave him commands to get out of the vehicle. The subject remained still and did not make any movements to indicate he was going to comply. Based on his actions and refusal to cooperate with any of our commands, I felt this subject was going to at least fight with us if we approached him to take him into custody. And at this time he had not been searched for weapons, nor had the interior of the vehicle been searched for weapons. Instead of approaching the vehicle any closer and risk our safety, I commanded my K9 partner Jedi to extract the subject from the vehicle.
>
> Jedi bit the subject on the right thigh and pulled him from the cab of the truck. The subject hit the ground and at that time myself and Officer Bateman were attempting to handcuff him. The subject continued to struggle and Sergeant Bourne assisted. Sergeant Bourne took over my position and took a hold of the subject's right wrist, which already had one handcuff applied. Once Sergeant Bourne took over my position, I gave Jedi the command to release. He released immediately upon command and he [plaintiff] was taken into custody without further incident.

See Dkt. #28, Ford Supplemental Narrative.

The Court also concludes that plaintiff's right to a warning before a police dog was commanded to "bite and drag" him from the truck was clearly established. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Id. "[A] victim's constitutional rights may be clearly established in the absence of a case 'on all fours prohibiting [the] particular manifestation unconstitutional conduct [at issue].'" Boyd, 374 F.3d at 781 (citing Deorle v. Rutherford, 272 F.3d 1272, 1286 (9th Cir. 2001) (alterations in original).

ORDER GRANTING IN PART AND DENYING
IN PART INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT              -10-

"The Supreme Court has provided little guidance as to where courts should look to determine whether a right was clearly established at the time of the injury." Id. In the Ninth Circuit, the Court first looks to binding precedent by the Supreme Court or this Circuit to determine whether a right was clearly established. Id. In the absence of binding precedent, the Court is instructed to "'look to whatever decisional law is available to ascertain whether the law is clearly established' for qualified immunity purposes, 'including decisions of state courts, other circuits, and district courts.'" Id. (citing Drummond v. City of Anaheim, 343 F.3d 1052, 1060 (9th Cir. 2003).

There is no Supreme Court authority specifically addressing whether a warning is required before releasing a police dog to bite. The Ninth Circuit has recently considered claims of excessive force by a police dog in six cases: Miller v. Clark County, 340 F.3d 959 (9th Cir. 2003); Brewer v. City of Napa, 210 F.3d 1093 (9th Cir. 2000); Watkins v. City of Oakland, 145 F.3d 1087 (9th Cir. 1998); Vera Cruz v. City of Escondido, 129 F.3d 659 (9th Cir. 1997); Chew v. Gates, 27 F.3d 1432 (9th Cir. 1994); Mendoza v. Block, 27 F.3d 1357 (9th Cir. 1994). In five of these cases, Miller, Brewer, Watkins, Vera Cruz and Mendoza, the police gave warnings before releasing the dogs. See Miller, 340 F.3d at 961 ("Deputy Bylsma yelled: 'This is the Sheriff's Office. You have five seconds to make yourself known, or a police dog will be sent to find you.'"); Brewer, 210 F.3d at 1094-95 ("Medlar drew his handgun and shouted a warning, informing the suspect that if he refused to surrender, a dog capable of biting would be released to locate him."); Watkins, 145 F.3d at 1090 ("Before releasing Nero to search for the person, Officer Chew announced twice: 'This is the Oakland Police Department canine unit. Give yourself up or I'll release my dog who is going to find you and he is going to bite you.'"); Vera Cruz, 139 F.3d at 660 ("When the officer identified himself, Vera Cruz began walking away. Distel then warned Vera Cruz to stop or he would release the dog; Vera Cruz started running. After giving another warning, Distel released the dog, who bit Vera Cruz on the right arm,

bringing him to the ground."); Mendoza, 27 F.3d at 1358 ("A deputy testified that the helicopter made at least 20 such announcements [that a dog might be deployed]."). In Chew, the Court did not mention whether a warning was given. However, Chew is distinguishable here because the case involved a concealed suspect.[5] Furthermore, as discussed below, since 1991 cases from other circuits have clearly established that when a suspect is not hiding, a warning is required before a police dog is released to bite. Because the Ninth Circuit has not expressly held that there is a right to a warning, the Court turns to the authority from other circuits.

In 1998, the Fourth Circuit in Vathekan v. Prince George's County, 154 F.3d 173 (4th Cir. 1998), held that "it was clearly established in 1995 that failing to give a verbal warning before deploying a police dog to seize someone is objectively unreasonable and a violation of the Fourth Amendment." Id. at 179 (citing Kopf v. Wing, 942 F.2d 265, 268 (4th Cir. 1991)). In 2003, the Eight Circuit in Kuha v. City of Minnetonka, 365 F.3d 590 (8th Cir. 2004), overruled on other grounds, Szabla v. City of Brooklyn Park, 2007 U.S. App. Lexis 11602, *27 (8th Cir. May 18, 2007) (en banc) ("abandoning" Part II.C of Kuha as circuit precedent),[6]

---

[5] See also Saucier, 533 U.S. at 202-203 ("Assuming, for instance, that various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand, the officer would not be entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard.").

[6] In Szabla, the dissent reiterated Kuha's holding. 2007 U.S. App. Lexis at *30-31 (en banc) (Gibson, J., dissenting) ("The need for a warning is not a detail. Under our precedent, it is a generally required safeguard, which may be dispensed with only if there are exigent circumstances. In Kuha v. City of Minnetonka, 365 F.3d 590 (8th Cir. 2004) (the part of it that is not overruled by the court's decision today), we held that 'a jury could properly find it objectively unreasonable to use a police dog trained in the bite and hold method without first giving the suspect a warning and opportunity for peaceful surrender.' Id. at 598. We held that 'there may be exceptional cases where a warning is not feasible.' Id. at 599. I understand Kuha to hold generally that it is unreasonable, hence unconstitutional, to command a dog to bite and hold without warning the person about to be bitten. The Fourth Circuit has so held. See Vathekan v. Prince George's County, 154 F.3d 173, 179 (4th Cir. 1998) ('[F]ailure to give a warning before releasing a police dog is objectively unreasonable in an excessive force context.').".

ORDER GRANTING IN PART AND DENYING
IN PART INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT         -12-

narrowed this broad pronouncement in the qualified immunity context by carving out an exception to the verbal warning requirement in cases where a suspect is hiding. However, while the Eight Circuit's holding in <u>Kuha</u> means a failure to warn in all cases is not <u>per se</u> objectively unreasonable, the Eighth Circuit followed the Fourth Circuit's holdings in <u>Vathekan</u> and <u>Kopf</u> that when a suspect is not concealed, a failure to warn is objectively unreasonable:

> Vathekan involved the release of a police dog into a house whereafter the dog found, bit, and seriously injured a sleeping woman. In an earlier Fourth Circuit case, <u>Kopf v. Wing</u>, 942 F.2d 265 (4th Cir. 1991), the court concluded that releasing a police dog, without warning, into an extremely narrow passage between a shed and a fence, where the suspects were essentially trapped, could be deemed objectively unreasonable. While <u>we agree with the general holding in both these cases</u>, they do not clearly establish that a verbal warning is always required. An officer could conclude, as Officer Anderson testified in this case, that in situations where the location of a suspect is less evident, a warning would place the officers at undue risk from a hiding suspect.

<u>Kuha</u>, 365 F.3d at 602-03 (emphasis added, internal citations omitted). <u>Kuha</u> was filed on May 8, 2003, before plaintiff's injury on October 6, 2003. See <u>Szabla v. City of Brooklyn Park</u>, 429 F.3d 1168, 1173 n.2.

In this case, plaintiff was not hiding from the police and was essentially trapped in the cab of the truck. Furthermore, in contrast to defendant Ford's lack of testimony regarding the warning referenced above, plaintiff unequivocally contends no warning was given before Jedi was released to "extract" him from the truck:

> Q. Were you ever – or did you ever hear any warning that a dog was going to be released?
>
> A. No, there was no warning.
>
> . . .
>
> Q. And are you definitely sure that you didn't hear a warning that the dog was going to be released?
>
> A. 100 percent sure.

See Dickinson Dep. at 27:22-24; 52:13-15; <u>see also id.</u> at 32:15-16 ("I had no warning that the animal was going to come in at me.").

ORDER GRANTING IN PART AND DENYING
IN PART INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT         -13-

In opposition, defendant Bateman claims in his declaration: "Dickinson was given repeated warnings that a dog would be released if he did not get out of the vehicle. The dog was also barking and Dickinson obviously knew a police dog was on scene. I acted as Officer Ford's cover officer as he gave additional warnings and then deployed the dog." Bateman Decl. at ¶13. Officer Ford's declaration, however, fails to mention a warning.[7] Furthermore, plaintiff claims there was no warning. In this case, because there is a genuine issue of material fact about whether a warning was given, summary judgment on qualified immunity is improper. Vathekan, 154 F.3d at 180 (reversing district court's grant of summary judgment on qualified immunity and holding that "[t]here is a genuine issue of fact whether [Corporal] Simms made a warning before releasing his dog into Vathekan's home. This factual dispute is enough to prevent the award of summary judgment on qualified immunity grounds.").

Based on persuasive out-of-circuit authority, if issuing a warning would not put the officers' safety in jeopardy, a non-concealed suspect has a right to warning before a police dog is released to bite.[8] This right is established clearly enough not to fall in the "hazy border between excessive and acceptable force" sufficient to deny defendants' immunity defense on summary judgment, especially in a case where the dog is deployed to "bite and drag" rather than just "bite and hold." See Saucier, 533 U.S. at 206.

### 3. Defendant Henson

In his motion and in reply, defendant Henson claims that he should be dismissed from the case because he did not have time and an opportunity to intervene in the release of police dog

---

[7] In contrast, plaintiff has attached several of defendant Ford's reports from other incidents all expressly stating that warnings were given to other suspects before Jedi was released. See Dkt. #29, Attach. #6.

[8] The Court also notes that defendants concede that a warning was required under the City of Kent's K-9 policy. See Dkt. #40 ("Plaintiff was in an enclosed area – the interior of a stolen vehicle. Kent's policy clearly states that a warning need be given under these circumstances.").

ORDER GRANTING IN PART AND DENYING
IN PART INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT           -14-

Jedi.  See Motion at 17 (citing Ting v. United States, 927 F.2d 1504, 1511-12 (9th Cir. 1991); Reply at ¶10 ("Officer Henson and Sergeant Bourne should be dismissed as they played no role in utilizing the force alleged by Plaintiff").  In his response, plaintiff offers no opposition to the dismissal of defendant Henson on qualified immunity.

Plaintiff has made no showing that defendant Henson was in a position to intervene in the release of police dog Jedi.  To the contrary, as defendant Henson's police narrative indicates, at the time of the incident, defendant Henson was occupied with taking Ms. Gabel into custody.  See Dkt. #28, Ex. 4.  Additionally, in his declaration, defendant Henson states:  "I did not have any contact with Plaintiff Dickinson in this matter.  I was also not involved with the decision to release K-9 Jedi."  Plaintiff has offered no evidence to the contrary.

Under Ting, bystander agents "may be held liable only if they personally deprived [the plaintiff] of a constitutional right by failing to perform an act which they were legally required to do which was the cause in fact of [the plaintiff's] injuries."  927 F.2d at 1511.  Based on the uncontradicted declaration of defendant Henson, he did not have any contact with plaintiff nor was he involved with the release of police dog Jedi.  There is no reason to conclude that defendant Henson, who was not the dog's handler, could have done anything to prevent the dog's attack.  Assuming otherwise is speculation, which is insufficient to create a genuine issue of material fact.  Accordingly, the Court concludes that defendant Henson acted reasonably and grants his motion for qualified immunity.

**4.  Defendant Bourne**

Defendant Bourne also seeks dismissal based on qualified immunity based on his lack of participation in the incident.  Plaintiff, however, contends that liability extends to defendant Bourne as defendant Ford's supervisor.  See Response at 19.  As defendant Ford's supervisor, defendant Bourne "can be held liable in his individual capacity if he participated in the deprivation of [plaintiff's] constitutional rights."  Watkins, 145 F.3d at 1093.  If defendant Ford

used excessive force, then defendant Bourne's "liability hinges on whether he 'set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury.'" Id. (citing Larez v. City of Los Angeles, 946 F.2d 630, 645 (9th Cir. 1991).

There is no dispute that defendant Bourne did not arrive on the scene until after police dog Jedi was released and had removed plaintiff from the truck. As defendant Bourne's uncontradicted declaration states:

> I arrived on scene at the intersection of Willis Street and Bridges Street after Officer Ford released K-9 Jedi and after K-9 Jedi had extracted Mr. Dickinson from the vehicle. At the time of my involvement, Plaintiff Dickinson was on the ground where Officers Ford and Bateman attempted to handcuff him. The subject continued to struggle. I assisted in taking over Officer Ford's position and took hold of the subject's right wrist which already had one handcuff applied. Once I took over the position, Officer Ford gave Jedi the command to release. Such was my only physical contact with Plaintiff Dickinson.

See Dkt. #22, Ex. D at ¶6. Given that defendant Bourne did not arrive on the scene until after Jedi's release, defendant Bourne could not have set in motion the application of force by Jedi. Therefore, the only way defendant Bourne can be held liable for the injuries caused by the dog is if defendant Bourne "knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." Watkins, 145 at 1093. At the time of defendant Bourne's involvement, police dog Jedi was biting plaintiff and plaintiff was struggling. There is no evidence that defendant Bourne had knowledge of the exact circumstances leading up to the use of the police dog. The record only shows that an hour before the incident, defendant Bourne instructed plaintiff and Ms. Gabel not to drive because of their intoxication. Id. at ¶4. Later, defendant Bourne was informed over the radio that defendant Bateman had stopped a vehicle involved in a reported DUI and listed as stolen and there were "uncooperative suspects inside." Id. at ¶5. Based on these undisputed facts and viewing the events from the "perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight," at the time defendant Bourne arrived there was no way

ORDER GRANTING IN PART AND DENYING
IN PART INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT         -16-

for him to reasonably know whether the use of Jedi was a constitutional application of force. <u>Graham</u>, 490 U.S. at 396.

There is also no evidence that defendant Bourne had the time or ability to stop Jedi from biting plaintiff. As plaintiff's expert has opined, a "properly trained patrol dog" should maintain a bite "until <u>commanded by the handler</u> to release." Dkt. #25 at §§ C, J (emphasis added). There is no dispute that defendant Bourne was not Jedi's handler, and there is no evidence that even if defendant Bourne had commanded Jedi to release that Jedi would have responded to the command. There is also no evidence that defendant Bourne had time to terminate the application of force by Jedi. By the time defendant Bourne arrived, Jedi was already biting plaintiff. And, by plaintiff's own account the entire biting incident lasted thirty to forty-five seconds. <u>See</u> Dickinson Dep. at 29:13-15. Based on all these factors, there is no reasonable basis to conclude that defendant Bourne could have done anything to prevent the dog's attack on plaintiff once it began. Plaintiff offers no evidence on this issue, only speculation, which is insufficient to create a genuine issue of material fact. Accordingly, the Court concludes that defendant Bourne acted reasonably and grants his motion for qualified immunity.

### III. CONCLUSION

For all of the foregoing reasons, defendants' "Motion for Summary Judgment Re: Qualified Immunity" (Dkt. #21) is GRANTED IN PART and DENIED IN PART. The motion is GRANTED with respect to defendants Henson and Bourne. The motion is DENIED with respect to defendants Ford and Bateman given the factual disputes in this case.

DATED this 22nd day of June, 2007.

*/s/ Robert S. Lasnik*
Robert S. Lasnik
United States District Judge

ORDER GRANTING IN PART AND DENYING
IN PART INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT          -17-